IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA


**Rachel Robledo**

    Plaintiff,

v.

**City of Tampa, Officer Shadai Cuningham,
Officer Joseph Estrada, Sgt. Shannon Murphy,
Officer Robin Sarrasin, Detective Neal Smith,
Captain Kevin Schoolmeesters**

    Defendants.

*8:25 cv 609 wFJ-SPF*

MAR 18 2025 PM3:25
FILED - USDC - FLMD - TPA


### COMPLAINT & DEMAND FOR A JURY TRIAL

Now Comes, Plaintiff RACHEL ROBLEDO, and complaining of the

CITY OF TAMPA, OFFICER SHADAI CUNNINGHAM, OFFICER JOSEPH

ESTRADA, SGT. SHANNON MURPHY, OFFICER ROBIN SARRASIN,

DETECTIVE NEAL SMITH AND CAPTAIN KEVIN SCHOOLMEESTERS

alleges as follows:

1. Rachel Robledo was illegally detained by Tampa Police Officers in

the aftermath of the Tampa Police Department's failed response to her March

17, 2021, call to police.

2. On March 17, 2021, Ms. Robledo called to report a man with a long

gun on a balcony in her apartment complex Bowery Bayside. The call was



classified in the Tampa Police Department's system as a Suspicious Person (Weapons/Life-Threatening) call.

3. Two months before, on January 18, 2021, Tampa Police responded to a 911 call of a man threatening the Bowery Bayside apartment complex with a gun. The Tampa Police shot the man after he raised his gun to them. https://www.tampabay.com/news/tampa/2021/01/19/tampa-officer-shoots-man-who-raised-gun-police-say/

4. On March 17, 2021, Tampa Police Officers Shadai Cunningham and Joseph Estrada were dispatched to respond to Ms. Robledo's call.

5. Officers Cunningham and Estrada were inexperienced officers who had struggled through training in the areas of "decision making," "self-initiated field activity", "investigations" and performance under stress.

6. Both officers had to have their probationary officer training extended because of their significant performance deficiencies, including in the area of "Officer Safety with Suspicious Persons."

7. Estrada and Cunningham did not conduct a proper investigation before improperly clearing Ms. Robledo's call for service and leaving the scene.

8. From the window of her apartment unit, Ms. Robledo observed the inadequate response and called 911 again.

2

9. Officers Cunningham and Estrada were again dispatched to investigate the call.

10. Upon arrival back on the scene, Officer Estrada and Officer Cunningham took a tactical approach outside Ms. Robledo's apartment.

11. Officer Estrada knocked on Ms. Robledo's door. Ms. Robledo was extremely scared to go outside. On the way out her door, Ms. Robledo's dog accidentally got out the door.

12. Officer Cunningham, who was in a tactical position outside Ms. Robledo's apartment, instantly fired two shots at Ms. Robledo's dog, Nala, hitting Nala in the head and in her left shoulder, near her heart.

13. Officer Cunningham went right to lethal force, without saying a word, instead of using non-lethal weapons, despite having awareness that Ms. Robledo had a dog and Officer Cunningham having been issued non-lethal weapons.

14. Officer Cunningham fired her gun in a dense residential environment, putting the lives of Ms. Robledo, Officer Estrada, and residents of the adjacent apartment units in danger.

15. During Officer Cunnigham's reckless firing of her gun, Officer Estrada was struck by one of Officer Cunningham's bullets.

16. After the shooting, Tampa Police Officers Estrada, Cunningham, Sarrasin and Murphy conspired to illegally detain Ms. Robledo, preventing

Ms. Robledo and a Good Samaritan from taking her dog who had large, life-threatening gunshot wounds to her head and shoulder to the Blue Pearl Emergency Veterinary Hospital.

17. The illegal detention of Ms. Robledo by Officers Estrada, Cunningham, Sarrasin, and Murphy was objectively unreasonable and violated clearly established law.

18. In the days after the shooting, Ms. Robledo filed complaints with the Tampa Police Department's (TPD's) Professional Standards Bureau against Officers Estrada, Cunningham, Sarrasin, and Murphy for illegal detention, the reckless use of lethal force, and failure to properly investigate her call.

19. Captain Kevin Schoolmeesters and Detective Neal Smith of TPD's Professional Standards Bureau did not conduct proper investigations of Ms. Robledo's serious complaints against the officers.

20. Schoolmeesters and Smith's refusal to properly investigate Ms. Robledo's complaints against the defendant officers violated Ms. Robledo's clearly established rights to procedural due process and obstructed Ms. Robledo's pursuit of justice.

21. Ms. Robledo brings this suit to vindicate the deprivations of her constitutional rights at the hands of the defendants.

4

## Jurisdiction & Venue

22. This action is brought pursuant to 42 U.S.C. § 1983 and Florida law to redress Defendants' tortious conduct and their deprivations of Ms. Robledo's rights secured by the U.S. Constitution.

23. This Court has jurisdiction of Ms. Robledo's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of her state-law claims pursuant to 28 U.S.C. § 1367.

24. Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Ms. Robledo's claims occurred within this judicial district, including the failed police response, illegal detention of plaintiff, and corrupt police investigations of the shooting and Ms. Robledo's complaints against the officers involved.

## Parties

25. Plaintiff Rachel Robledo was illegally detained by Tampa Police despite there being no legal basis, delaying her and a Good Samaritan from taking her dog, who had been recklessly shot by Tampa Police Officer Shadai Cunningham, to the emergency veterinary hospital.

26. At all times relevant to the events described in this Complaint, Defendants Shadai Cunningham, Joseph Estrada, Robin Sarrasin, Sgt. Shannon Murphy, Detective Neal Smith and Captain Kevin Schoolmeesters were Officers in the Tampa Police Department. For purposes of this

Complaint, Murphy, Sarrasin, Cunningham, Estrada, Smith, and Schoolmeesters are collectively referred to as "Police Officer Defendants."

27. Defendant City of Tampa is a municipal corporation that is or was the employer of Defendants Cunningham, Estrada, Sarasin, Murphy, Smith and Schoolmeesters. Each of the Defendants named in this Complaint acted during the March 17, 2021, incident and its aftermath, including the subsequent investigation, as agents or employees of the City of Tampa. The City of Tampa is liable for all torts committed by the Defendants pursuant to the doctrine of respondeat superior. Additionally, the City of Tampa is responsible for the policies and practices of the Tampa Police Department, and is liable for the violations of Plaintiff's rights caused by the unconstitutional policies and customs of the Tampa Police Department, including actions of the abovenamed Defendants employed by the City of Tampa undertaken pursuant to those policies and customs during the March 17, 2021 incident and the departmental response and investigation of the incident.

28. Each and every individual Defendant, known and unknown, acted under color of law and within the scope of their employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in their individual capacity unless otherwise noted.

## The Failed Police Response

29. Officers Estrada and Cunningham were inexperienced, failure-prone Officers who TPD knew had consistently struggled to perform under stress, conduct thorough investigations, and handle service calls involving Suspicious Persons and Weapons.

30. Both Officers Estrada and Cunningham also regularly displayed behaviors consistent with duty avoidance when they were failing probationary officers in TPD's Field training Evaluation Program (FTEP) in 2020.

31. On March 17, 2021, Estrada and Cunningham were dispatched to the Bowery Bayside Apartments to respond to Ms. Robledo's call for service of a Suspicious Person with a long gun on a balcony.

32. When dispatched, Estrada and Cunningham had issues navigating the Bowery Bayside Complex, despite it being a large apartment community in their zone that had a high-volume of calls for service.

33. Officers Estrada and Cunningham became disoriented and had to ask the apartment complex's trash valet for directions.

34. Estrada and Cunningham eventually parked their vehicles and walked on foot to Ms. Robledo's apartment building.

35. In front of Ms. Robledo's apartment, Officer Estrada turned on his flashlight and said, "I don't know, I don't see anybody out here." The officers then separated.

36. Then Officer Estrada walked behind Ms. Robledo's building and said, "I don't see anybody outside, I'm cutting off the camera. No victim. No

7

crime other than a possible (inaudible)" on his body-worn camera microphone. Then Officer Estrada turned off his camera.

37. While Officer Estrada was talking to his microphone behind Ms. Robledo's apartment building, Officer Cunningham walked over to the building that Ms. Robledo reported to dispatch- the building to the right of Ms. Robledo's building- and conducted a brief recon of the area before abandoning her investigation to go locate Estrada.

38. Officer Cunningham found Estrada, behind Ms. Robledo's apartment building, away from the building they were supposed to investigate, and both officers left the scene.

39. Officers Estrada and Cunningham did not have a tactical approach to the investigation, they did not effectively coordinate or communicate with each other.

40. Officers Estrada and Cunningham did not conduct a thorough investigation. They improperly cleared a Suspicious Person (Weapon/ Life-Threatening) call, leaving the scene not having performed their duties.

41. Ms. Robledo observed form the window of her apartment that Estrada and Cunningham left without investigating.

42. Ms. Robledo called the police again and asked if the officers had made contact with the person connected to the apartment unit where Ms. Robledo saw a man with a long gun on the balcony.

43. Dispatch informed Ms. Robledo that the Officers did not make contact with the individual.

44. Estrada and Cunningham were again dispatched to the call.

45. When learning that the call had been updated, Officers Estrada

and Cunningham communicated via text messages using TPD's Mobile Dispatch Terminal (MDT) system.

46. Officer Estrada sent an MDT text to Cunningham, "Let's go back."

47. Officer Cunningham responded to Estrada, "Smh, people get on my nerves. It's Florida people are allowed to have guns in their homes."

48. Officer Estrada called Ms. Robledo from his cellphone.

49. Officer Estrada was rude and unprofessionalism in his call with Ms. Robledo. Officer Estrada insisted that Ms. Robledo come outside and assist him if he returned.

50. Ms. Robledo believed she had told dispatch all the information that the officers needed to investigate her call and was extremely scared to go outside.

51. Officer Estrada and Officer Cunningham took a tactical approach outside Ms. Robledo's apartment.

52. Officer Estrada knocked on Ms. Robledo's door. Ms. Robledo was extremely scared to go outside. On the way out her door, Ms. Robledo's dog accidentally got out the door.

53. Officer Cunningham instantly fired two shots at Ms. Robledo's dog, Nala, hitting Nala in the head and in her left shoulder, near her heart.

54. Officer Cunningham recklessly fired her gun, endangering the lives of Ms. Robledo, Officer Estrada, and the people living in the adjacent apartment units. Ms. Robledo feared for her life.

55. Officer Estrada was hit by one of Cunningham's bullets. When she fired her gun, Estrada said, "Oh shit, what are you doing?" to Cunningham.

9

56. Immediately after the shooting, Ms. Robledo was in shock, believing her dog had been fatally shot. Ms. Robledo was screaming for help.

57. Ms. Robledo said to her neighbors, "She [Officer Cunningham] was almost going to shoot me."

58. Immediately after Ms. Robledo's comment, Officer Cunningham said on her body-worn camera, "Bye, dog."

### Estrada Tells Cunningham He Got Shot

59. In the minutes after the shooting, Officer Cunningham had a conversation with Officer Estrada captured on both officer's body-worn cameras.

60. Officer Cunningham asked Officer Estrada, "Did you get sh? Did you get hit?"

61. Officer Estrada asked Cunningham, "What happened?"

62. Cunningham responds, "I don't know."

63. Estrada said, "Shadai, man, when you shot.." apparently turning off his microphone mid-sentence.

64. Officer Cunningham asked Estrada in response, "Let me see, you got shot?"

65. Officer Estrada responded, "I got a little bit of..."

66. The Tampa Police Department has concealed from the public that Officer Cunningham shot Officer Estrada when she recklessly fired her weapon, shooting Ms. Robledo's dog.

## The Illegal Detention

67. Minutes after the shooting, Ms. Robledo and her neighbors found Nala, still alive, bleeding profusely with two large, life-threatening gunshot wounds, one to her head and one to her left shoulder.

68. Ms. Robledo and her neighbors put Nala in Ms. Robledo's car to transport her to Blue Pearl Emergency Animal Hospital to save Nala's life.

69. Ms. Robledo asked her neighbors, "Can somebody come with me because I smell the blood?"

70. Officer Estrada responded, "We need you to stay."

71. Ms. Robledo said to Estrada, "I'm not staying." Ms. Robledo then went to retrieve her purse from her apartment so she could quickly get Nala to Blue Pearl.

72. The neighbor who carried Nala to the car sees another police car arriving and tells Estrada, "Don't let them block her (Ms. Robledo's car) in."

73. Estrada says, "She's (Ms. Robledo) persisting on getting her dog to the vet."

74. The neighbor tells Estrada, "The dog has been shot."

75. Officer Robin Sarrasin, an officer with 11 sustained violations of department policy and a history of misconduct, arrives on the scene.

76. A neighbor tells Officer Sarrasin, "The dog took two rounds."

77. Sarrasin asks, "Where is the dog?"

78. The neighbor said, "Right there with all the blood on its face" pointing to Nala in the front, passenger seat of Ms. Robledo's car.

79. Sarrasin callously responded, "Well, people need to keep their dogs on leashes, that's why it's a law."

80. Sarrasin then positioned herself to obstruct Ms. Robledo's car, driven by a Good Samaritan with Ms. Robledo and Nala in the vehicle, from leaving to go to the emergency veterinary hospital.

81. Onlookers told Sarrasin, "Get out of the way."

82. Sarrasin then knocked on Ms. Robledo's car window and demanded, "Roll the window down."

83. Ms. Robledo was in a state of distress, crying, "I got to go." The Good Samaritan, Max, also told Sarrasin, "We have to go."

84. Sarrasin then callously said "Stop," for Ms. Robledo to stop crying.

85. Sarrasin then said, "We have an ambulance coming for the dog," despite the fact Sarrasin knew that the ambulance was there to respond to Officer Estrada's bullet wound.

86. An onlooker told Sarrasin, "Paramedics are not veterinarians."

87. Another onlooker, a female member of the United States military whose father is a police officer, then told Sarrasin, "You are restricting her (Ms. Robledo's) movements."

88. Sarrasin starts screaming at Ms. Robledo and arguing with Ms. Robledo, blaming her for the incident.

89. Neighbors pleaded with other officers on scene to let Ms. Robledo leave, "You have her contact information, you have her address right here."

90. Sarrasin then uses her radio to ask a supervisor, "Are we allowing the owner of the dog to transport the dog to a vet or are we having paramedics check it?"

91. Sarrasin was told by the supervisor, "Paramedics aren't going to work on a dog." Despite this, Sarrasin continued to illegally detain Ms. Robledo.

92. Ms. Robledo attempted to call 911 to report the illegal detention.

93. Sarrasin told Robledo, "Do not call 911, we are already here."

13

94. Ms. Robledo believed that Tampa Police Officers were illegally detaining her and allowing Sarrasin to berate her, while preventing her from taking her dog with life-threatening gunshot wounds to the vet, to create the circumstances for an unlawful arrest.

95. Sarrasin continued to illegally detain Ms. Robledo, while other officers onsite did not intervene.

96. A paramedic approached the car and said, "I honestly don't ever work with animals, I mean, I could put a bandage on him, but I would take him to the vet immediately."

97. Ms. Robledo said, "That's what we're trying to do."

98. Sarrasin said, "Sarge said 'no 'that's why they're still here," referring to Sergeant Shannon Murphy."

99. The paramedic seemed bewildered that Ms. Robledo wasn't allowed to take her dog to the emergency vet. He said, ""Why would?..."

100. Ms. Robledo said, "My dog could have internal bleeding." Nala had two large, gruesome gunshot wounds and had lost a lot of blood.

101. Ms. Robledo said to Sarrasin, "You want to defy his (the paramedic) professional opinion."

14

102. Officer Sarrasin, Sergeant Murphy, Officer Estrada and other on-scene Tampa Police Officers continued to illegally detain Ms. Robledo for seven more crucial minutes before letting her leave to get Nala emergency veterinary care.

103. Ms. Robledo was very upset, believing her dog could die while she was being illegally detained.

104. An African American male neighbor, a military veteran, attempted to comfort Ms. Robledo through the car window.

105. Officer Sarrasin said to him, "Brother, I don't know you" and pushed him.

106. Ms. Robledo pleaded that Sarrasin be replaced on the scene by someone more professional. Sarrasin berated and abused Ms. Robledo and her neighbors during TPD's illegal detention of Ms. Robledo.

107. Ms. Robledo pleaded, "Please let me talk to the Sergeant."

108. Sarrasin responded, "He's on the phone, he's trying to talk to someone else to find out if we can let you leave."

109. During the illegal detention both Officer Estrada and Sergeant Murphy asked Ms. Robledo her full name and birthdate.

110. Sergeant Murphy did not wear a body-worn camera during the March 17, 2021, incident where he illegally detained Ms. Robledo. The Tampa Police Department body-worn camera policy allows Supervisors like Sgt. Murphy to not wear body cameras.

111. The Tampa Police Department illegally detained Ms. Robledo for twelve minutes, preventing her from taking her dog who had life-threatening gunshot wounds to the vet.

112. The Tampa Police Department's illegal detention of Ms. Robledo was cruel, objectively unreasonable, and a violation of clearly established constitutional law.

113. The Police Officer Defendants knew Ms. Robledo's phone number and address and could have followed her to Blue Pearl Emergency Veterinary Hospital. The Tampa Police Department had no legal basis to detain Ms. Robledo.

114. On the way to Blue Pearl, the Good Samaritan and Ms. Robledo, concerned they had lost time to save Nala's life due to the illegal detention, almost got into a car accident.

115. At Blue Pearl, Ms. Robledo was able to save Nala's life, having to borrow money from her widowed mother to pay for the hospital bills.

16

116. Hours after the shooting, Officer Sarrasin, Officer Estrada, and another Tampa Police Officer made light of the incident in MDT text messages.

117. Estrada and officer Bryan Czop discussed getting something to eat via MDT text.

118. Czop wrote. "what r u going to eat a....HOT DOG.......!"

119. Estrada responded, ""hold the bullets on that one!"

120. Sarrasin added, ""bwahahahaha!"

**TPD: Inadequate Officer Training and Action for Officer Failures**

121. Tampa Police Field Training Officers in the Field Training and Evaluation Program (FTEP) documented a large catalog of disqualifying performance failures and deficiencies by Officer Cunningham and Officer Estrada, but did not take the appropriate action.

122. Field Training Officers and Supervisors negligently retained and negligently passed failing probationary officers who were not competent to work as police officers to satisfy the goals of City policymakers.

123. City policymakers prioritized their policy objectives above proper officer training and public safety.

17

124. In a 2021 lawsuit, JOHN FITZGERALD vs CITY OF TAMPA, Corporal John Fitzgerald, alleged corruption of the Tampa Police Department's Field Training Evaluation Program (FTEP) and retaliation against whistleblowers by the Department.

125. Fitzgerald claimed that supervisors violated the rules of the Field Training Evaluation Program to help a failing Probationary Officer who "had a difficult time with the Field Training exercises and struggled to advance through the program."

126. Fitzgerald asserted:

"On or about August 30, 2019, Assistant Chief Bercaw replaced Captain Tony Zambito with Captain Stout as head of the Field Training Program. Chief Bercaw saw that P.O. Lafontant was at risk of failing out of the Training Program if she received a low score on her shift set for August 30, 2019. In light of this, Chief Bercaw directed Captain Stout to suspend evaluations for P.O. Lafontant."

127. The lawsuit continued:

"Chief Bercaw's decision to suspend evaluations for P.O. Lafontant violated the Tampa Police Department's Field Training Protocol. The Tampa Police Department follows the San José Model in its Field Training Program."

128. The San Jose Model of police training was developed by the San Jose Police Department after a fatal at-fault crash involving a young San Jose Police officer. The San Jose Model was developed to replace the inadequate training of the time, giving departments a program to document

performance deficiencies and terminate trainees who did not possess the skills and competencies to be a police officer. The San Jose Model of police training is used by the Tampa Police Department and a large percentage of police agencies nationwide.

129. The Fitzgerald complaint states:

"Allowing a Probationary Officer to temporarily avoid evaluations undermines the evaluation process and gives that probationary Officer an unfair advantage over the other trainees. It could also allow an Officer to graduate from the program without being adequately prepared to work on the streets."

130. In the lawsuit, Corporal Fitzgerald alleges that he and Sergeant Liza Doane were retaliated against for objecting to supervisors breaking the integrity of the Tampa Police Departments Field Training and Evaluation Program (FTEP) for probationary officers.

131. The Fitzgerald lawsuit said that Captain Mike Stout told Sergeant Doane that she "needed to get on board the Mayor's agenda" and that Stout "aggressively told her [Sergeant Doane] to 'shut her mouth.'"

132. The complaint went on to say that Captain Stout transferred Fitzgerald out of the training squad and replaced Corporal Fitzgerald with Corporal Jergens Pierre "as the Corporal Field Training Officer for District II. Corporal Pierre had less time with the Department, less time as a Corporal, and was significantly less qualified than Fitzgerald to fill the role."

133. In sum, Corporal Fitzgerald alleges that the Tampa Police Department violated the integrity of its training program for probationary officers and retaliated against officers in the Field Training Squad who objected to the dangerous lowering of standards and breaking of training protocols, creating a climate where Field Training Officers (FTOs) were pressured to pass failing probationary officers or face retaliation.

**Cunningham's History of Disqualifying Performance Failures**

134. Officer Cunningham was a failing probationary officer who had to have her Field Training extended twice due to her performance deficiencies. In a July 14, 2020, Letter entitled, Phase III - 1st Extension Request for Probationary Officer Shadai Cunningham, Corporal Margo Fergusson wrote to Captain Mike Stout:

> Probationary Officer Shadai Cunningham's Phase III of training will be finished on July 15th, 2020. PO Cunningham finished Interval 10 at 84%, and Interval 11 at 65%. Based on her performance, PO Cunningham is not expected to obtain a 100% during interval 12. PO Cunningham failed to achieve 100% in Interval 11 and is not on track to obtain 100% in Interval 12. Both intervals require 100% to matriculate to Phase IV. PO Cunningham has had Issues involving officer safety with suspicious persons/prisoners, problem solving/decision making ability, investigative procedures, and oral communication."

135. Throughout her Field Training Evaluation Program training, Officer Cunningham consistently demonstrated incompetence. Documentation of her training reveals that Field Training Officers (FTOs) described Cunningham as "overwhelmed," "confused," "timid," "oblivious,"

20

"hesitant," "unreasonable," and "reckless" in their notes to describe her performance.

136. Field Training Officers used the word "struggled" over 40 times to describe Cunningham's performance in their Display Averages Reports.

137. In a July 31, 2020, Letter entitled, Phase III – 2nd Extension Request for Probationary Officer Shadai Cunningham, Corporal Margo Fergusson wrote:

> "PO Cunningham will be tasked with determining if the incident requires police attention as this is the area she continues to struggle with.... PO Cunningham will also be asked continue (sic) to conduct traffic stops as well as investigating any criminal offense she observes to improve her ability to conduct self-initiated field activity. PO Cunningham has shown an increase in rationalizing situations instead of following up on them.

138. On August 14, 2020, during Cunningham's second FTEP extension, she had a serious Officer Safety Failure documented by FTO Onix Ortiz.

139. In an August 16, 2020 Alternate Interval Training Report, Corporal Jergens Pierre, does not mention the 8-14-2020 incident where Cunningham performed "recklessly" and "clearly placed herself and other officers on the scene at risk" though the incident was only two days prior to his report.

140. On August 29, 2020, in a document entitled Periodic Report Type: Final FTEP Training Report, Corporal Timothy Gaddis formally passed

Officer Cunningham from the Field Training Evaluation Program (F.T.E.P):

> "Officer Cunningham has successfully completed F.T.E.P. and has shown she is capable of conducting a thorough investigation and transposing the information obtained into a well written report. She has demonstrated good Officer Safety and understands the importance of knowing her surroundings and dangers subjects pose. She has also demonstrated that she is able to maintain control of scenes and exhibits a calm demeanor when dealing with individuals in crisis."

141. Officer Cunningham was negligently passed through TPD's Field Training and Evaluation Program, citing her "good Officer Safety", just two weeks after Cunningham's serious performance failure of 8-14-20, where FTO Ortiz said Cunningham "recklessly released the suspect's right/arm wrist" and that "Her actions clearly placed herself and the other officers on scene at risk by releasing the suspect's right arm."

142. Despite Cunningham's disqualifying incompetence, Field Training Officers employed by the City of Tampa negligently passed Cunningham through the Field Training Evaluation Program, putting an unqualified officer on the street, to satisfy the policy goals of City leaders.

**Estrada's History of Performance Failures and Misconduct**

143. Officer Estrada was a failing probationary officer who had to have his Field Training extended due to his noted performance deficiencies in the areas of knowledge, investigations, and performing under stress.

144. In a July 14, 2020, Letter entitled, Phase III - 1st Extension Request for Probationary Officer Joseph Estrada, Corporal Margo Fergusson wrote to Captain Mike Stout:

> "Currently, PO Estrada's training plan will focus on his overall issues with field performance stress (category #3), officer safety with suspicious subjects/prisoners (category #6), investigative procedures (category #11), and knowledge departmental policies and procedures (category #19)."

145. Estrada failed three written tests during FTEP training that required Captain Mike Stout to give Estrada a Training Letter of Counseling.

146. In the Letter of Counseling, Captain Stout wrote:

> "This is your **third failure** of a test while participating in the Field Evaluation training Program of the Tampa Police Department. Your actions were in direct violation of Tampa Police Department's Field Training Evaluation Program. It is the intent of this letter to reinforce that it is your obligation to study and prepared (sic) for all tests in accordance to the F.T.E.P."

147. Despite Officer Estrada's serious performance red flags related to knowledge, competence, commitment, and the ability to perform under stress, Estrada was passed through FTEP training on 8-14-2020.

148. Just two months after he was negligently passed through TPD's FTEP training, Officer Estrada was the subject of an internal affairs investigation (20D-185) where he was found to have 1087: Failed to Comply with Departmental Policies: SOP: 314.2 Domestic Violence and SOP 609.9 Body Worn Recording Equipment.

149. During Internal Affairs Case 20-D-185, Lieutenant G.A. Neal determined Estrada had failed to investigate the call properly and failed to communicate with his fellow officer. Neal concluded: "Officer Estrada failed to recognize the call for service was a domestic violence investigation and did not relay his findings to MPO Hesselink" and "Officer Estrada cleared the call for service as a disturbance without doing a complete investigation and submitting a report as required."

150. Four days before Estrada's catastrophic failures of March 17, 2001, on Ms. Robledo's call for service, he received another Citizen Complaint.

151. On March 13, 2021, a Citizen Complaint against Officer Joseph Estrada was lodged alleging "there was a video on "Tic Tok (sic)" which showed officers ignoring a female who just reported a burglary to her apartment."

152. During the investigation of the 3-13-21 complaint, Detective Neal Smith and others determined that Estrada again failed to fill out a necessary police report, but Estrada did not receive "progressive discipline", and the complaint never became a formal investigation.

**TPD Refuses to Investigate Citizen Complaints**

153. Incompetence is a progenitor of corruption. The decision by City of Tampa leaders and the Tampa Police Department administrative staff to

24

violate the methodology of TPD's San Jose Model based Field Training and Evaluation Program allowed for the negligent admittance of unqualified probationary officers into the department and led to corruption in the Professional Standards Bureau.

154. On March 26, 2021, Ms. Robledo filed complaints against Defendant Officers Cunningham, Estrada, Sarrasin, and Murphy in the online portal under Service Type: Professional Standards Bureau- Tampa Police.

155. After several negative interactions with TPD's Professional Standards Bureau staff, creating a concern about the integrity of any investigation they would conduct, Ms. Robledo wanted to create a digital record of her complaints.

156. Ms. Robledo's complaints against the police officer defendants involved serious officer misconduct—an illegal detention in violation of her rights secured by the Fourth Amendment, reckless use of lethal force, abusive treatment of the public, and the failure to properly investigate her call for service.

157. On about April 7, 2021, Ms. Robledo noticed that her complaints were changed to a status of Closed in the portal.

158. Ms. Robledo asked Corporal Thanasas of the Professional Standards Bureau why the status of her complaints was changed to closed.

25

159. Corporal Thanasas replied in a portal message,

"Your complaint and the internal investigation into the incident are not closed. They are being investigated by Det. Neal Smith under investigation number 21R-003...Your complaint submitted via internet, as well as your phone calls, have been forwarded to Det. Smith to add to his investigation."

160. On April 28, 2021, after a phone conversation with Detective Neal Smith where Detective Smith was unprofessional and didn't know Ms. Robledo's last name more than a month into the investigation, Ms. Robledo emailed Detective Smith, copying Captain Schoolmeesters, telling them that she had made complaints in the portal against the officers and that Corporal Thanasas had said she had sent them to Detective Smith.

161. On May 12, 2021, Ms. Robledo emailed Detective Smith and Captain Schoolmeesters the exact text of her complaints against Officers Cunningham, Estrada, Sarrasin and Murphy to their Tampa.gov email addresses.

162. On June 3, 2021, Ms. Robledo had a sworn, telephonic interview conducted by Detective Smith as part of the investigation.

163. During the telephonic interview, Detective Smith displayed no interest in investigating Ms. Robledo's complaints against the officers and would not let Ms. Robledo talk about the officers illegally detaining her.

164. Detective Smith stopped the recording of the interview without telling Ms. Robledo beforehand and abruptly ended the call.

165. On October 4, 2020, Captain Kevin Schoolmeesters sent Ms. Robledo an email telling her the case was closed, accompanied with case files.

166. None of the files Captain Schoolmeesters provided to Ms. Robledo involved any evidence related to Officer Sarrasin or Sgt. Murphy.

167. Detective Neal Smith and Captain Schoolmeesters never investigated Ms. Robledo's complaints against the officers.

168. On October 6, 2021, Ms. Robledo emailed Captain Schoolmeesters, copying Assistant City Attorney Michael Schmid:

> "As I have made you aware the following were the complaints I sent to your Internal Affairs Division in relation to the incident where Officer Shadai Cunningham recklessly shot my dog rather than use non-lethal weapons that she had been issued. During her reckless shooting, she shot Officer Estrada. Afterward, Officers Sarrasin and SGT Murphy illegally detained me, preventing me from getting timely emergency veterinary care at the vet hospital. Also, of major concern to your investigators should have been the initial, inadequate response by Officer Cunningham and Officer Estrada to my initial call. That disposition letter is the end of the investigation?"

169. Captain Schoolmeesters never responded to that email.

170. Based on information and belief, Detective Smith and Captain Schoolmeesters never investigated Ms. Robledo's serious complaints against the Police Officer Defendants and didn't properly record them in the officers' files despite knowing the performance failures and misconduct histories of the officers involved and having body camera footage that verified Ms. Robledo's complaints.

## Plaintiff's Damages

171. Ms. Robledo called the police for help and was sent officers who the Tampa Police Department knew couldn't perform their duties.

27

172. Ms. Robledo's call for service was for a Suspicious Person with a gun, a life-threatening call. Tampa Police Officers breached their duty to investigate her call.

173. Tampa Police Officers put Ms. Robledo in harm's way by directing her to come out of her apartment during a dangerous call for service.

174. Tampa Police Officer Shadai Cunningham who was negligently passed through TPD's Field Training and Evaluation Program for Probationary Officers used reckless lethal force, threatening Ms. Robledo's life and shooting her dog in the head in front of her.

175. Ms. Robledo feared that Officer Cunningham would shoot her.

176. The Tampa Police Department's cruel and illegal detention of Ms. Robledo, preventing her from taking her dog with life-threatening gunshot wounds to the emergency vet, traumatized Ms. Robledo, making her feel powerless and unprotected by clearly established Constitutional law.

177. Tampa Police Officer Shadai Cunningham's reckless gunfire hit Officer Estrada. The Tampa Police Department's concealment of Estrada's gunshot wound has hidden the truth of the police failures of this incident from the public and damaged Ms. Robledo's reputation.

178. The Tampa Police Department's refusal to investigate Ms. Robledo's complaints against these Officers has compounded Ms. Robledo's suffering and obstructed her pursuit of justice.

179. In addition to the severe trauma of witnessing the shooting of her dog and fearing that she could be killed by a reckless Tampa Police Officer, the Defendants' misconduct continues to cause her extreme psychological and emotional pain and suffering.

180. Ms. Robledo has been traumatized and humiliated. She has suffered negative affects to her physical health and post-traumatic stress as a result of this reckless shooting and police misconduct.

181. Having to carry the burden of this injustice, while dealing with life-changing trauma, has involved great pain and suffering and anguish.

### Count 1
### 42 U.S.C. § 1983 – Illegal Detention (Fourth Amendment)

182. As set forth in paragraphs 67-113, Defendants Murphy, Sarrasin, Estrada, and Cunningham, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, illegally detained Ms. Robledo without any probable cause for doing so and in spite of the fact that they knew Ms. Robledo had committed no crime and was desperately trying to transport her dog who had life-

threatening bullet wounds caused by the wrongful, reckless shooting by Officer Cunningham, in violation of Ms. Robledo's rights secured by the Fourth Amendment.

183. In so doing, the Defendants caused Ms. Robledo to be deprived of her liberty without probable cause, detained without probable cause, and maliciously prevented from getting timely emergency veterinary care for her wrongfully shot dog, Nala.

184. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights and wellbeing of Ms. Robledo and the life of her dog Nala.

185. As a result of Defendants' misconduct described in this count, Ms. Robledo suffered great mental anguish, acute and post-traumatic stress, humiliation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above in paragraphs 171-181.

## Count 2
### 42 U.S.C. § 1983 – Failure to Intervene

186. As set forth in paragraphs 67-112, Defendants Cunningham, Estrada, Sarrasin, and Murphy, during the constitutional violations

30

described in this Complaint, stood by without intervening to prevent the violation of Ms. Robledo's constitutional rights, even though they had the duty and the opportunity to do so.

187. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights and wellbeing of Ms. Robledo.

188. As a result of Defendants' failure to intervene to prevent the violations of Ms. Robledo's constitutional rights, Ms. Robledo suffered great mental anguish, acute and post-traumatic stress, humiliation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above in paragraphs 171-181.

189. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 4.

## Count 3
### 42 U.S.C. § 1983 – Due Process (Fourteenth Amendment)

190. As set forth in paragraphs 152-170, Defendants Smith and Schoolmeesters, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Ms. Robledo of her constitutional right to due process.

31

191. In the manner described more fully above, Smith and Schoolmeesters engaged in misconduct by refusing to investigate Ms. Robledo's citizen complaints against Officers Sarrasin, Murphy, Estrada and Cunningham, including serious allegations of a violation of Ms. Robledo's rights secured under the Fourth Amendment. This refusal to investigate a citizen complaint of serious officer misconduct deprived Ms. Robledo of a fair proceeding and additional evidence that could be used to vindicate her rights.

192. The Defendants deliberately refused to investigate officer misconduct, despite having proof of officer misconduct on body-worn camera recordings. This refusal to investigate deprived Ms. Robledo of sworn officer statements and other evidence that would have been obtained in an investigation with due process. Officers Schoolmeesters and Detective Smith concealed evidence of officer misconduct relating to the Defendants' illegal detention of Ms. Robledo; the failure of the officers to conduct a proper investigation of Ms. Robledo's call to police, the wounding of Officer Estrada by a bullet shot by Officer Cunningham, and the malicious texts making light of the incident by Officers Estrada and Sarrasin in the hours after the shooting.

193. In addition, based upon information and belief, Defendants Schoolmeesters and Smith concealed additional evidence that is not yet known to Ms. Robledo.

194. The Defendants' misconduct described in this count resulted in the failure to investigate and hold accountable Tampa police officers demonstrating dangerous incompetence, dereliction of duty, and engaging in unlawful misconduct, threatening the lives and rights of citizens, thereby denying Ms. Robledo the constitutional right to a fair proceeding guaranteed by the Fourteenth Amendment. Absent this misconduct, the officers who put Ms. Robledo's life in danger and who violated her rights would have been held accountable, and Ms. Robledo would have had due process as she pursued the vindication of her rights.

195. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth.

196. As a result of Defendants' misconduct described in this count, Ms. Robledo suffered a loss of justice, great mental anguish, humiliation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above in paragraphs 171-181.

33

197. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 4.

## Count 4
## 42 U.S.C. § 1983 – Policy & Custom Claims Against the City of Tampa

198. The City of Tampa employed individual Defendants Cunningham, Estrada, Sarrasin, Murphy, Smith, and Schoolmeesters, supervised them and promulgated policy (including both written policies and unwritten customs) that caused the illegal detention and due process violations of Ms. Robledo.

199. Ms. Robledo's injuries described in this Complaint and the violations of her constitutional rights discussed above were caused by the policies and customs of the City of Tampa, as well as by the actions of policymaking officials for the City of Tampa.

200. At all times relevant to the events described in the Complaint and for a period of time before and after, the City of Tampa either had inadequate rules, regulations, policies, and procedural safeguards or failed to promulgate adequate rules, regulations, policies, and procedural safeguards governing: the training and retention of officers-not limited to probationary officers, the

34

use of body-worn cameras, the internal investigations of officer misconduct and performance failures, the proper handling of citizen complaints, the production of public records, and the discipline and termination of officers who engage in misconduct or demonstrate incompetence.

201. At all times relevant to the events described in this Complaint and for a period of time before and after, the City of Tampa had notice of practices and customs of officers and agents of the Tampa Police Department that included one or more of the following: (1) Field Training officers were pressured to pass failing probationary officers who were not ready to be on the streets; (2) officers did not properly investigate and clear calls for service (3) officers in the professional standards division did not properly investigate the misconduct and performance failures of their fellow officers; (4) officers in the professional standards division did not properly investigate or document citizen complaints against officers; (5) officers illegally detained citizens and committed other constitutional violations and misconduct and were not adequately trained, supervised, investigated, or disciplined.

202. Officers and agents of the City of Tampa failed to promulgate proper or adequate rules, regulations, policies, and procedures notwithstanding the obvious need for such rules, regulations, policies, and

procedures.

203. Had officers and agents of the City of Tampa promulgated appropriate policies, then the violations of Ms. Robledo's constitutional rights would have been prevented.

204. TPD has a history of low professional standards that have led to constitutional violations.

205. In 2024, City of Tampa agreed to settle with Robert DuBoise a man that was wrongly convicted in 1983 and incarcerated for 37 years because of TPD's poor officer training, negligent supervision of officers, and failure to investigate and discipline officers who engage in misconduct.

206. In March of 2022, Mary O'Connor, a candidate who had been fired for TPD for battery on a police officer before being rehired, was named Police Chief despite opposition from members of the Tampa City Council and warnings from experts in policing. https://www.tampabay.com/news/tampa/2022/02/02/in-picking-tampas-police-chief-mayor-has-much-to-weigh/

207. In April 2022, TPD under O'Connor added a controversial mute feature to its body-worn cameras. https://www.cltampa.com/news/tampa-police-add-controversial-mute-function-to-body-worn-cameras-13321619

208. In May of 2022, O'Connor took a picture with Officer Algenis Maceo who had been named officer of the month. Maceo had been fired by TPD and rehired. He had 18 violations of TPD policy, six of which occurred after he was rehired in 2020.

https://www.cltampa.com/news/tampa-police-departments-officer-of-the-month-was-fired-then-rehired-and-the-problems-continued-13525726

209. In December of 2022, Chief O'Connor had to resign in for violating TPD's Abuse of Position policy after local media unearthed body camera footage of O'Connor flashing her badge to a Pinellas Deputy to get out of a ticket. https://www.cnn.com/2022/12/05/us/tampa-police-chief-mary-oconnor-resigns/index.html

210. In December of 2024, TPD Reserve Officer Shelby Riggs-Hopkins shot a man near Amalie Arena. As a TPD Reserve Officer, Riggs-Hopkins did not have to wear a body-worn camera. Previously, Riggs-Hopkins was fired from the Orlando Police Department after mistaking Krispy Kreme doughnut glaze for meth. The Orlando PD had to pay out a settlement for the incident. TPD hired her. https://www.tampabay.com/news/breaking-news/2024/12/30/tampa-reserve-police-officer-shoots-wounds-man-near-sparkman-wharf/

211. Despite knowledge of the problems with the Professional Standards Bureau to conduct investigations of TPD Officers, City officials advocated for the abolishment of TPD's Citizen Review Board.

212. The Tampa City Council dissolved the Citizen Review Board in December of 2024, further eroding transparency and accountability within the department.

213. The individual Defendants have a history of misconduct. For example, Captain Kevin Schoolmeesters, the Captain in charge of the Tampa Police Department's Professional Standard division has violations of the department's Standard of Conduct, Abuse of Position/Identification, and Departmental Property, Restriction of Use policies.

214. Captain Schoolmeesters was also an officer involved in the BLUDSAW v. STATE (2003) case where Tampa Police Officers were found by District Court of Appeal of Florida, Second District to have illegally detained an individual without reasonable suspicion.

215. Officer Sarrasin has 11 violations of departmental policy including failures to comply with the department's Firearms, Standard of Conduct, Abuse of Position or Identification, Operation of Police Vehicles, and Subpoenas policies.

216. Upon information and belief, the TPD has observed unlawful or otherwise improper conduct by Sarrasin throughout her career but has tolerated it and refused to remedy or mitigate it.

217. TPD's decision to further lower standards by violating the integrity of its Field Training Evaluation Program, a program based on the San Jose Model- a training model designed to protect citizens from unqualified and dangerous cops and law enforcement agencies from the liability of hiring bad officers- has led to constitutional violations.

218. The City of Tampa frequently fails to terminate or discipline officers who demonstrate patterns of misconduct or incompetence.

219. The TPD has a contractual and/or operational relationship with the Police Union that makes it hard to discipline and terminate officers who demonstrate incompetence or engage in misconduct.

220. Not only did the final policymakers in the City of Tampa have notice of illegal policies and practices, but they also knew the failure to uphold high professional standards, provide proper officer training, conduct proper supervision of officers, and conduct thorough investigations of officer wrongdoing would lead to constitutional violations. That is because the need for adequate policies, high professional standards, proper officer training, proper officer supervision, and thorough investigations of officer misconduct was so obvious that the failure to enact them demonstrated the policymakers' deliberate indifference to the constitutional violations that occurred in Ms. Robledo's case.

221. Ms. Robledo's injuries and the constitutional violations she suffered were caused by officers, agents, and the employees of the City of Tampa, including but not limited to the Defendants, who acted pursuant to one of more of the policies, procedures, and customs set forth above in engage in the misconduct described in this Complaint.

WHEREFORE, Plaintiff RACHEL ROBLEDO respectfully requests that this Court enter a judgment in her favor and against Defendants City of Tampa, Officer Shadai Cunningham, Officer Joseph Estrada, Officer Robin Sarrasin, Sgt. Shannon Murphy, Detective Neal Smith and Captain Kevin Schoolmeesters; awarding compensatory damages, attorneys' fees, and costs against each Defendant; awarding punitive damages against each of the individual Defendants; and any other relief that this Court deems just and appropriate.

**Demand for a Jury Trial**

Plaintiff RACHEL ROBLEDO hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,


Rachel Robledo


Tampa Justice Project

Attn: Rachel Robledo

32789 Eiland Blvd. Unit 470

Wesley Chapel, FL 33545

(813) 561-8851

TampaJusticeProject@gmail.com

41