## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**RACHEL ROBLEDO,**

    Plaintiff,

                              Case No. 8:25-cv-0609-WFJ-SPF

v.

**CITY OF TAMPA,** et al.

    Defendants.

_____/

## <u>ORDER</u>

Before the Court are Defendants Shadai Cunningham, in her individual capacity; Joseph Estrada, in his individual capacity; Shannon Murphy, in his individual capacity; Neal Smith, in his individual capacity; Kevin Schoolmeesters, in his individual capacity; Robin Sarrasin, in her individual capacity; and the City of Tampa's (the "City") Motions to Dismiss. Dkts. 10, 16, and 17. Plaintiff Rachel Robledo has responded in opposition. Dkts. 18, 21, and 22. After careful consideration, the Court grants Defendants' motions to dismiss.

## BACKGROUND

This dispute arises out of the shooting of Plaintiff Robledo's unleashed pit bull by the Tampa Police Department (the "TPD").[1] On March 17, 2021, Ms. Robledo called 911 to report that a suspicious person armed with a long gun was on

---

[1] In Plaintiff's responses, Ms. Robledo makes several references to the "body-worn camera" recordings from the various Defendant-officers. *See e.g.,* Dkt. 18 at 3. Plaintiff states that she has possession of these recordings. *Id.* at 13. These recordings are neither attached to the Complaint nor anywhere else in the record. As such, the Court only considers and recounts the factual allegations within the four corners of Plaintiff's Complaint. *See* Dkt. 1.

a balcony of a building within her apartment complex. Dkt. 1 ¶ 31. TPD dispatched Defendant-officers Estrada and Cunningham in response to the 911 call. *Id.* When the officers arrived at the Bowery Bayside Complex, they did not encounter or find anyone armed with a gun. *Id.* ¶¶ 32–40. Ms. Robledo observed the officers' arrival and the fact that they never encountered anyone with a gun. *Id.* ¶¶ 41–43.

After Officers Estrada and Cunningham left the apartment complex, Ms. Robledo called 911 again and informed dispatch that the officers had failed to properly investigate the unknown individual with a gun. *Id.* ¶¶ 40, 42. TPD dispatched Officers Estrada and Cunningham back to Plaintiff's apartment complex, with Officer Estrada calling Ms. Robledo to obtain additional information about the suspicious person. *Id.* ¶¶ 44–49. Officers Estrada and Cunningham then went to Plaintiff's apartment and "took a tactical approach outside" her door. *Id.* ¶ 51. When officers knocked on her door, Ms. Robledo alleges that she was "extremely scared to go outside." *Id.* ¶ 52. In the process of answering the door, Plaintiff's unleashed dog, Nala, "accidentally got out." *Id.* At this point, Officer Cunningham "instantly fired two shots at" Nala, hitting the dog in the head and left shoulder. *Id.* ¶ 53. Officer Estrada was hit by one of Officer Cunningham's bullets. *Id.* ¶ 55.

Minutes after the shooting, Ms. Robledo and her neighbors found Nala and placed her into Plaintiff's vehicle with the intention of getting her to the animal hospital. *Id.* ¶ 68. Officer Estrada stopped her, stating "[w]e need you to stay." *Id.* ¶

70. Ms. Robledo replied, "I'm not staying," and went back into her apartment to grab her purse without interference from Officer Estrada. *Id.* ¶ 71. During this time, other officers were arriving on scene, including Defendant-officer Robin Sarrasin, who allegedly blocked Plaintiff from leaving with her police vehicle. *Id.* ¶ 80. Bystanders appeared and joined in the affair, instructing the officers. *Id.* ¶¶ 81–89. Officer Sarrasin told Ms. Robledo that "an ambulance [is] coming for the dog." *Id.* ¶ 85. Following more verbal altercations, Officer Sarrasin radioed her supervisor asking, "Are we allowing the owner of the dog to transport the dog to a vet[,] or are we having paramedics check it?" *Id.* ¶ 90. The supervisor responded, "Paramedics aren't going to work on a dog." *Id.* ¶ 91.

At some undetermined point, Defendant Shannon Murphy (a sergeant with the TPD) arrived on scene. *Id.* ¶¶ 107–109. When Ms. Robledo asked to speak with Sergeant Murphy, Officer Sarrasin told her that Sergeant Murphy was "on the phone, he's trying to talk to someone else to find out if we can let you leave." *Id.* ¶¶ 107–108. During this time, Officers Estrada and Sergeant Murphy obtained Ms. Robledo's full name and date of birth. *Id.* ¶ 109. Plaintiff was permitted to leave, and Nala was brought to the veterinarian's hospital, where she was treated for her gunshot wounds, which were not fatal. *Id.* ¶ 115. Ms. Robledo estimates that she was "illegally detained" for twelve minutes. *Id.* ¶ 111.

On March 26, 2021, Plaintiff filed an online complaint with the TPD against Defendant-officers Cunningham, Estrada, Sarrasin, and Murphy. *Id.* ¶ 154. The complaint was assigned to Defendant-detective Neal Smith. *Id.* ¶ 159. Approximately one week after submitting the online complaint, Plaintiff noted that the status of the complaint had been closed. *Id.* ¶ 157. She was informed that her complaint was still open. *Id.* ¶ 159. On April 28, 2021, Plaintiff spoke to Defendant Smith over the phone. *Id.* ¶ 160. Following this phone call, Plaintiff emailed Smith, copying Defendant-Captain Kevin Schoolmeesters. *Id.* On May 12, 2021, Ms. Robledo emailed Defendants Smith and Schoolmeesters a second time about her complaint. *Id.* ¶ 161. In June 2021, Defendant Smith conducted a recorded telephone interview with the Plaintiff. *Id.* ¶ 162. Plaintiff states Defendant Smith would not listen or let her talk on the call, *id.* ¶¶ 163–64, and Defendants Schoolmeesters and Smith would not investigate her complaint. *Id.* ¶¶ 167–70. On October 4, 2021, Ms. Robledo received an email from Defendant Schoolmeesters indicating that her complaint was closed, along with some accompanying documents. *Id.* ¶ 162–165.

On March 13, 2025, Plaintiff Robledo filed suit, alleging Fourth Amendment violations under 42 U.S.C. § 1983 for unlawful detention by Cunningham, Estrada, Sarrasin, and Murphy (Count I); failure to intervene to stop the unlawful detention by Cunningham, Estrada, Sarrasin, and Murphy (Count II); failure to investigate her internal affairs complaint and deprivation of due process by Smith and

Schoolmeesters (Count III); and a *Monell* claim against the City for failure to train and supervise (Count IV). *See* Dkt. 1. Defendants responded by filing the instant motions to dismiss, contending that all officers are entitled to qualified immunity and that the City is not the moving force behind any constitutional violation. *See* Dkts. 10, 16, and 17.

## LEGAL STANDARD

A complaint withstands dismissal under Federal Rule of Civil Procedure 12(b)(6) if the alleged facts state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not require detailed factual allegations but demands more than an unadorned accusation. *Id.* All facts are accepted as true and viewed in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

However, because Ms. Robledo is proceeding *pro se*, her pleadings are held to a less stringent standard than pleadings drafted by an attorney and will be liberally construed. *See Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). While the Court applies less stringent pleading standards to complaints in *pro se* actions, a *pro se* plaintiff remains subject to the same laws and rules of the Court, including the Federal Rules of Civil Procedure and the Local Rules for the Middle

District of Florida, as a litigant represented by counsel. *See Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989).

## DISCUSSION

For the reasons discussed below, the Court grants Defendants' motions to dismiss. As pled, the Court finds that all Defendant-officers are entitled to qualified immunity and each count is due to be dismissed.

### I.    Qualified Immunity

The qualified immunity defense shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012). "[E]ntitlement to qualified immunity is for the court to decide as a matter of law." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018).

The Eleventh Circuit teaches that: "As an immunity from suit, qualified immunity is *not*, as the district court stated, 'more appropriately resolved at the summary judgment sta[g]e or later in the proceedings.' To the contrary, our precedents mandate its resolution 'at the earliest possible stage in litigation.'" *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1334 (11th Cir. 2025) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994)).

Generally, it is proper to grant a motion to dismiss on qualified immunity grounds when the "complaint fails to allege the violation of a clearly established constitutional right." *Id.*; *see also Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). This is a question of law, and the Court accepts "the facts alleged in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). "Once an officer has raised the defense of qualified immunity, the burden of persuasion on that issue is on the plaintiff." *Id.*

To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citations and internal quotations omitted). Once this showing is made, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right and (2) this right was clearly established at the time of the alleged violation. *Id.* at 1340–41.

As an initial matter, there is no dispute that Defendant-officers Cunningham, Estrada, Sarrasin, Murphy, Smith, and Schoolmeesters were acting within the scope of their discretionary authority when interacting with Ms. Robledo. Plaintiff's Complaint concedes that each Defendant "acted under the color of law and within the scope of their employment at all times relevant to this lawsuit." Dkt. 1 ¶ 28. Indeed, accepting the facts alleged in the Complaint as true, each Defendant had

been "performing a function that, but for the alleged constitutional infirmity, would have fallen within his [or her] legitimate job description" with the TPD. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). As such, Plaintiff has the burden to show that the officers violated a constitutional right and that this right was clearly established at the time of the alleged violation. The Court begins with the claims of illegal detention and failure to intervene in Counts I and II, then considers the due process claim in Count III, and concludes with Plaintiff's *Monell* claim against the City of Tampa in Count IV.

### a. Illegal Detention Claim—Count I

Beginning with Plaintiff's "illegal detention" claim, Defendants argue that Ms. Robledo was not "seized" under the Fourth Amendment when officers requested she stay on scene following the shooting of Nala and Officer Estrada. Dkt. 10 at 5. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains [the person's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks omitted). Even a temporary detention for only a brief period of time constitutes a "seizure" within the

meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

"The test for whether the officer restrained a citizen's liberty is whether 'a reasonable person would feel free to terminate the encounter.'" *United States v. Knights*, 989 F.3d 1281, 1286 (11th Cir. 2021) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)). The Court "must imagine how an objective, reasonable, and innocent person would feel, not how the particular suspect felt." *Id.* (citations omitted). "All the circumstances are relevant, including whether a citizen's path is blocked or impeded; whether the officers retained the individual's identification; the suspect's age, education and intelligence; the length of the . . . detention and questioning; the number of police officers present; whether the officers displayed their weapons; any physical touching of the suspect; and the language and tone of voice of the police." *Id.* (citation and internal quotations omitted). The Court will address each Defendant separately as it pertains to their actions towards Plaintiff following Nala's shooting.

Here, accepting the factual allegations in the Complaint as true, Ms. Robledo has not alleged that Defendant Cunningham participated in any "illegal detention." As Defendants' motion to dismiss correctly articulates, "[t]he allegations in paragraphs 67 through 120 do not mention or reference[] Cunningham. The Complaint does not indicate where Cunningham was at the time that Plaintiff was

detained. The Complaint does not allege that Cunningham told Plaintiff she could not leave. The Complaint does not allege that Cunningham blocked or restricted Plaintiff's movements." Dkt. 10 at 6; *see also* Dkt. 1 ¶¶ 67–120. Plaintiff's vague and conclusory allegation that "other on-scene Tampa Police Officers continued to illegally detain Ms. Robledo" is insufficient to include Defendant Cunningham in her "illegal detention" claim. Dkt. 1 ¶ 102. Because there are no allegations that Defendant Cunningham used physical force or a show of authority to restrain Plaintiff's freedom of movement, the Court finds that Defendant Cunningham is entitled to qualified immunity as to Count I.

Next, even liberally construing the factual allegations, the Court cannot say that a reasonable person would not have felt free to leave during the encounter with Defendant Estrada, who had just been injured in the shooting. Ms. Robledo alleges that Defendant Estrada told her, "We need you to stay." Dkt. 1 ¶ 70. But, there are no other factual allegations that Defendant Estrada used physical force or a show of authority to prevent Plaintiff from leaving the scene. For example, the Complaint never recounts that Defendant Estrada physically touched Plaintiff, that Estrada displayed his service weapon when telling the Plaintiff to stay, that Estrada used coercive language or a tone of voice suggesting Plaintiff was not free to leave, that Estrada retained Ms. Robledo's identification, or that Estrada blocked or impeded Ms. Robledo's car. On the contrary, the Complaint appears to allege that Plaintiff

was free to leave, as Ms. Robledo told Defendant Estrada, "I'm not staying," and then freely returned to her apartment to retrieve her car keys and purse. Dkt. 1 ¶ 71. After getting those items, Plaintiff entered her vehicle without any interference from Defendant Estrada. *Id.*; *see also Knights*, 989 F.3d at 1286–87 ("Knights was physically capable of walking away. He also could have driven away, and the officers did not display their weapons, touch Knights, or even speak to him—let alone issue any commands or ask him for his identification and retain it. And before the officers approached Knights, they did not activate the lightbar or siren on the patrol car, and as we have mentioned, they allowed Keaton to leave the car, ignore their invitation to talk, and enter the home where the car was parked."); *United States v. Ligon*, No. 21-11351, 2022 WL 2091598, at *2 (11th Cir. June 10, 2022) ("The record shows a reasonable person would have felt free to leave prior to this command because, in the beginning of the interaction, Ligon walked away from Griffin."). Thus, the Court finds that Defendant Estrada is entitled to qualified immunity as to Count I.

As to Defendants Murphy and Sarrasin, the Complaint sufficiently alleges that a reasonable person would not feel free to leave based on their actions. Plaintiff recounts that Defendant Sarrasin "positioned herself to obstruct Ms. Robledo's car . . . from leaving to go to the emergency veterinary hospital" and repeatedly disregarded Plaintiff's requests to leave. Dkt. 1 ¶¶ 80–109; *see Ligon*, 2022 WL

2091598, at *2. While not entirely clear, Plaintiff also seems to allege that Defendant Sarrasin was acting on orders from Defendant Murphy when preventing Plaintiff from leaving the scene. *Id.* ¶¶ 96–110. Thus, liberally construing the Complaint and accepting the factual allegations as true, Defendants Murphy and Sarrasin, by using physical force and a show of authority, "seized" Plaintiff by restraining her freedom of movement. As such, the Court must determine whether the "seizure" violated the Fourth Amendment.

As pled in the Complaint, the officers never arrested Ms. Robledo; rather, the officers briefly detained her following Nala and Officer Estrada's shooting. *See* Dkt. 1 ¶¶ 68–111. However, the Court still applies a "seizure" analysis under the Fourth Amendment because "whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person." *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019) (quoting *Michigan v. Summers*, 452 U.S. 692, 696 n.5 (1981)). Put differently, "an innocent bystander who is not suspected of any wrongdoing may be seized—in some cases reasonably and in other cases potentially unreasonably—within the meaning of the Fourth Amendment." *Id.*

To determine whether Ms. Robledo's twelve-minute "seizure" was reasonable, the Court applies the test outlined in *Terry v. Ohio*, 392 U.S. 1, 16 (1968) for a seizure that "lack[s] the essential attributes of full, custodial arrests." *Croom v. Balkwill*, 645 F.3d 1240, 1246 (11th Cir. 2011). In *Terry*, the Supreme Court set out

a two-part inquiry to evaluate the reasonableness of an investigative stop. *United States v. Acosta*, 363 F.3d 1141, 1144 (11th Cir. 2004). First, the Court must "examine whether the officer's action was justified at its inception, which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime." *Id.* at 1144–45 (internal quotation marks and citations omitted). Second, a court must "determine[] whether the stop went too far and matured into arrest before there was probable cause" by considering "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 1145 (internal quotation marks and citations omitted).

Under the first prong of the *Terry* inquiry, the Eleventh Circuit has noted that reasonable suspicion "is not concerned with 'hard certainties, but with probabilities.'" *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "To show that an officer has reasonable suspicion, the officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1302 (11th Cir. 2021) (citations and internal quotations omitted). Further, reasonable suspicion may "be based on commonsense judgments and inferences about human behavior." *Id.* at 1303 (citation omitted). "[W]e look to the totality of the circumstances to determine the existence of

reasonable suspicion." *Id.* (quoting *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011)).

Here, based on the allegations in the Complaint and the totality of the circumstances, Officer Sarrasin (and, by extension, Sergeant Murphy as the supervisor on scene)[2] had reasonable suspicion to briefly detain Ms. Robledo following a shooting after dark, where a possible sniper-type subject was reported, and an unleashed dog and an officer had been shot.

First, Defendants Sarrasin and Murphy were responding (at night)[3] to an apartment complex that has a history of "a high volume of calls for service," Dkt. 1 ¶¶ 31–32, (i.e., a high-crime area).[4] An unknown individual had been reported with a "long gun on a balcony," and an officer and an unleashed dog had just been shot. Dkt. 1 ¶¶ 3, 31, 32, 42, 60–65.

Second, arriving only minutes after the shooting, Officer Sarrasin was faced with a confusing, evolving, and escalating situation where a distraught Ms. Robledo and neighbors were getting vocal and frustrated with law enforcement. *Id.* ¶¶ 75–109. Plaintiff has been screaming. *Id.* ¶ 56. Plaintiff also told neighbors Officer

---

[2] Officers are allowed to conduct a *Terry* stop on an individual based on "the collective knowledge of the officers involved in the stop." *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (quoting *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989)). As such, the information Officer Sarrasin observed can be extended to Sergeant Murphy.

[3] *See* Dkt. 10 at 22 (Plaintiff's response describing Defendant Sarrasin's actions as occurring at "night"); Dkt. 1 ¶ 35 (stating Officer Estrada used a flashlight at the scene).

[4] Indeed, the Complaint even references a news article—two months before Nala's shooting—about TPD officers responding to the Bowery Bayside apartment complex following 911 calls about a man with a gun. Dkt. 1 ¶ 3. TPD officers ultimately shot the individual they encountered. *Id.*

Cunningham "was almost going to shoot me." *Id.* ¶ 57. Ms. Robledo's refusal to cooperate with Officer Sarrasin and confusion about whether the paramedics would treat Nala once they arrived only exacerbated tensions. *Id.* ¶¶ 81–91; *see United States v. Heard*, 725 F. App'x 743, 754 (11th Cir. 2018) ("Factors like known criminal activity in an area; time of day; proximity, both temporal and geographic, to reported suspicious activity; unusual nervousness; and refusal to cooperate can certainly contribute to reasonable suspicion.").

Third, and perhaps most importantly, once learning that it was an unleashed dog that was shot, Officer Sarrasin articulated that Plaintiff was required to keep her dog on a leash, as per the City of Tampa's local ordinances. Dkt. 1 ¶ 79; *see also* Tampa, Fla., Ordinances ch. 19, art. I, § 19-75 (2025) ("It is unlawful for an owner of an animal to permit the animal to run at large upon any public place or upon unenclosed lands or upon the premises of another person within the limits of the city."); Tampa, Fla., Ordinances ch. 16, art. I § 16-38(a)–(b) (2025) ("All such animals must be restrained by the handler and the handler must be in direct control at all times at a distance not greater than six (6) feet in length from the handler [animal], unless in a designated off-leash area. . . . (b) As used herein, the term 'direct control' means immediate, continuous physical control of an animal at all times such as by means of a fence, leash, cord or chain, or other means, of such

strength to restrain the animal.").[5] At a minimum, Defendants were permitted to temporarily detain Ms. Robledo to investigate whether the loose pit bull violated the City of Tampa's leash ordinance. *See United States v. Allen*, 447 F. App'x 118, 121 (11th Cir. 2011) ("[T]he officers had a reasonable and articulable suspicion that Allen had just violated Atlanta's ordinances by crossing a street in front of oncoming traffic.").

When considering the totality of the circumstances—i.e., "the whole picture"—the Court finds the "detaining officers [had] a particularized and objective basis for suspecting" some criminal activity was afoot. *Cortez*, 449 U.S. at 417. While reports of a shooting in a high-crime area at night (standing alone) might be insufficient to tip the balance to reasonable suspicion, *Heard*, 725 F. App'x at 752, the additional fact that Officer Sarrasin learned that Nala was off-leash in the moments right before the shooting means the responding officers had a specific, articulable, objective basis for conducting an investigatory *Terry* stop into the incident that transpired just minutes before. And it was night when Plaintiff insisted on a suspect nearby on a balcony with a long gun. At a minimum, this is "arguable"

---

[5] Hillsborough County has similar leash ordinances. Hillsborough Cnty., Fla., Ordinances ch. 6, art. II, § 6-28 (a), (d) (2025); "[N]o dog or cat shall be allowed to stray, run or go, at large upon any public property or street, sidewalk, park, or on the private property of another without the consent of the property owner. . . . (d) In order for a dog or cat to be allowed on a public street, road, park or other public property, . . . the dog or cat shall be under the direct control of the owner or keeper."); Hillsborough Cnty., Fla., Ordinances ch. 38, art. II, § 38-26(d) ("All domestic animals must, unless otherwise posted, be restrained at all times at a distance of not greater than six feet in length from their owner/handler and must be under the immediate and continuous physical control of such animal's owner/handler by means of a leash, cord, chain, cage, fence or other appropriate restraining device that is of sufficient strength to restrain/contain the animal.").

reasonable suspicion. *See Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop."). Defendants Sarrasin and Murphy do not lose their entitlement to qualified immunity where they "reasonably but mistakenly concludes that reasonable suspicion is present." *Id.* at 1165–66.

Once the first prong of the *Terry* inquiry is met, the Court must then consider the second step—"whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place[.]" *Gonzalez-Zea*, 995 F.3d at 1304. "[A]n initially lawful investigatory stop may become unlawful if it is 'prolonged beyond the time reasonably required to complete' the purpose of the stop." *Id.* at 1305 (quoting *Rodriguez v. United States*, 575 U.S. 348, 355–57 (2015)); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). "[T]he reasonableness of the duration of an investigative stop cannot be delineated exactly . . . [and] 'common sense and ordinary human experience must govern over rigid criteria.'" *Courson v. McMillian*, 939 F.2d 1479, 1491 (11th Cir. 1991) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

Here, the Court readily finds that Defendants Sarrasin and Murphy's twelve-minute stop of Ms. Robledo was reasonable and not prolonged beyond the time necessary to complete the purposes of the stop. Ms. Robledo was not touched, restrained, or physically moved. Because Plaintiff was an eyewitness to the incident in which her dog and an officer were shot, it was not unreasonable for Officer Sarrasin to temporarily detain Ms. Robledo to get her name, birthdate, address, and phone number. Dkt. 1 ¶ 109. These identification questions were related in scope to the circumstances that justified the stop in the first place, confirming whether Ms. Robledo was an eyewitness to the shooting and the owner of the unleashed dog. *See Gonzalez-Zea*, 995 F.3d at 1305 ("These identification questions were related in scope to the circumstances that justified the stop in the first place—confirming whether the driver of the vehicle was the fugitive."). In the Complaint, Plaintiff assumes that law enforcement must have already obtained all that information based on her initial 911 call, but there are no allegations that such information was conveyed to Defendants Sarrasin and Murphy when they arrived on scene. Dkt. 1 ¶ 113.

Importantly, the Supreme Court has also warned that courts "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Sharpe*, 470

U.S. at 686.[6] With this warning in mind, the alleged facts demonstrate that Defendants Sarrasin and Murphy "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly" by obtaining Ms. Robledo's identification and detaining her only long enough for emergency services to arrive on the scene, where paramedics informed Ms. Robledo and law enforcement that Nala needed to be taken to a veterinarian. *Id.*; Dkt. 1 ¶¶ 83–101, 109. Indeed, because the investigatory stop was not unreasonably prolonged, Nala survived her injuries. Dkt. 1 ¶ 115.

Nor does the Court believe a twelve-minute stop (that did not ripen into an arrest or even resemble one) to be unreasonable under the circumstances. *See Acosta*, 363 F.3d at 1148 ("Thirty minutes duration is not beyond the pale of reasonableness for *Terry* stops, as our prior decisions make clear."); *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (finding a detention for approximately seventy-five minutes in handcuffs in the back of a patrol car did not exceed the duration allowable under *Terry*); *Courson*, 939 F.2d at 1491 (finding "approximately thirty minutes, the majority of the time having been spent awaiting assistance, was not unreasonable for an investigatory stop"); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (permitting fifty minute detention); *United States v. Willis*, 759 F.2d 1486, 1497

---

[6] While this case does not involve the use of excessive force, the Supreme Court has also noted "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving[.]" *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

(11th Cir. 1985) (finding a twenty-five minute investigatory detention to be reasonable under the circumstances and not an arrest). Unlike the twelve-minute stop at issue in this case, considerably longer periods of time for investigatory detentions have been deemed unreasonable. *See United States v. Place*, 462 U.S. 696, 700 (1983) (finding ninety minutes too long); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984) (finding 140 minutes too long).

Therefore, the Court finds that Ms. Robledo's unrestrained delay in departing for approximately twelve minutes, the majority of which was spent awaiting emergency services and confirming that Ms. Robledo was free to leave the scene to take Nala to the veterinarian, was not unreasonable for an investigatory stop. Because Ms. Robledo's brief detention was reasonable under *Terry*, she failed to carry her burden of showing that Defendants Sarrasin and Murphy's conduct violated her Fourth Amendment rights. Defendants Sarrasin and Murphy are also entitled to qualified immunity on Plaintiff's illegal detention claim in Count I.

### b. Failure to Intervene Claim—Count II

A law enforcement officer can be directly liable under § 1983 when he "fails or refuses to intervene when a constitutional violation . . . takes place in his presence." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) (citation omitted). "An officer's duty to intervene is triggered when he sees a fellow officer use excessive force." *Callwood v. Jones*, 727 F. App'x 552, 560 (11th Cir. 2018). In

other words, when an officer "observed no use of excessive force which might have given rise to a duty to intervene to stop it," the officer is under no duty to intervene. *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996). A failure to intervene claim stems from and is "wholly dependent" on an underlying constitutional violation. *Sebastian*, 918 F.3d at 1312. If no constitutional violation was being committed, then an officer cannot be liable for failing to intervene. *Id.* ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed.").

Here, Ms. Robledo's failure to intervene claim against Defendants Cunningham, Estrada, Sarrasin, and Murphy is predicated on her claim of illegal detention, not excessive force. *See* Dkt. 1 ¶ 186. As such, Plaintiff's failure to intervene claim is improper when the underlying constitutional violation is not excessive force. *See Callwood*, 727 F. App'x at 560; *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000) ("That a police officer had a *duty to intervene* when he witnessed the use of *excessive force* and had the ability to intervene was clearly established in February 1994." (emphasis added)). Regardless, even if "illegal detention" was a proper underlying violation, for the reasons discussed above, the Court has found that no constitutional violation was committed that required intervention. *See Sebastian*, 918 F.3d at 1312. The Court grants

Defendants' motions to dismiss Count II against Cunningham, Estrada, Sarrasin, and Murphy.

      *c. Due Process Claims—Count III*

Turning to Plaintiff's due process claim under the Fourteenth Amendment, Ms. Robledo alleges that Defendants Smith and Schoolmeesters "engaged in misconduct by refusing to investigate Ms. Robledo's citizen complaints against" Defendants Cunningham, Estrada, Sarrasin, and Murphy. Dkt. 1 ¶ 191.

The Due Process Clause of the Fourteenth Amendment guarantees citizens that no State shall deprive them of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has been interpreted to provide two distinct guarantees: substantive due process and procedural due process. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Plaintiff's Complaint does not articulate which type of due process claims she is bringing against Defendants Smith and Schoolmeesters. Under either type of due process claim, Count III is due to be dismissed.

Substantive due process protects rights that "are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994). The Constitution creates substantive due process rights, and "no amount of process can justify [their] infringement." *Id.* When examining a substantive due process violation, a court must first identify the asserted right and

then determine whether that right is fundamental. *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005). Fundamental rights include "most—but not all—of the rights enumerated in the Bill of Rights" and certain unenumerated rights. *McKinney*, 20 F.3d at 1556.

Here, as to any alleged substantive due process violation, the Court readily finds that Ms. Robledo does not have a fundamental right to the investigation of her misconduct claims against the various TPD officers. *See, e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (concluding that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002) (finding that the plaintiff had "no substantive right of any kind to an investigation of her excessive force complaint . . . much less one created by the Constitution"); *Walker v. Dixon*, 840 F. App'x 397, 403 (11th Cir. 2020) (finding that a family services agency's failure to properly investigate and uncover sexual abuse was not a substantive due process violation); *Stringer v. Doe*, 503 F. App'x 888, 890–91 (11th Cir. 2013) (finding the plaintiff "failed to state claims against the sheriff or deputy sheriff because Stringer did not have a substantive due process right to an internal investigation by the Sheriff's Department or law enforcement"); *Koger v. Fla.*, 130 F. App'x 327, 335 (11th Cir. 2005) (citing *Vinyard* and finding "a plaintiff had no substantive due process right to an investigation of a constitutional claim by a sheriff's office"). Because Ms.

Robledo does not have a constitutionally protected right at stake, she has failed to state a plausible claim for relief under section 1983.

As to Plaintiff's procedural due process claim, these rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1213 (11th Cir. 1996) (citation omitted). These rights may be rescinded "so long as the elements of procedural—not substantive—due process are observed." *McKinney*, 20 F.3d at 1556. In other words, procedural due process guarantees fair procedure and "requires notice and an opportunity to be heard before any governmental deprivation of a [constitutionally-protected] interest." *Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir. 1995). "[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney*, 20 F.3d at 1557; *see also Cotton v. Jackson*, 216 F.3d 1328, 1330–31 (11th Cir. 2000).

"[A] [section] 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)). Under the first element, "[p]roperty interests stem not from the Constitution, but from such sources as statutes,

regulations, ordinances, and contracts." *Arrington v. Helms*, 438 F.3d 1336, 1348 (11th Cir. 2006) (citation omitted). "Whether these sources create a property interest must be decided by reference to state law." *Id.*

Here, Plaintiff does not cite any federal or state court decision, statute, regulation, or other source of law that confers a constitutionally protected interest in the investigation of her police misconduct claim. As Defendants correctly point out, Florida law outlines the rights that sworn law enforcement officers have during an internal affairs investigation, as set forth in Florida Statutes § 112.531–112.534. Dkt. 10 at 11. Conversely, the Court cannot find any statute, law, regulation, or rule in Florida that establishes the right of any citizen to an internal affairs investigation of law enforcement officers following a citizen complaint. Without such an interest, Ms. Robledo cannot maintain a procedural due process claim against Defendants Smith and Schoolmeesters. *See Vineyard*, 311 F.3d at 1356 (finding no procedural due process violation because there is no "federal or state court decision, statute, regulation or other source of law that gives [the plaintiff] an entitlement to an internal investigation by the Sheriff's Office of her complaints of police brutality"); *Koger*, 130 F. App'x at 335 (holding the plaintiff "failed to identify in his amended complaint a federal or state law under which he was entitled to an internal investigation"); *Merriweather v. Stringer*, No. 2:21-CV-145-MHT-SMD, 2021 WL 6137515, at *6 (M.D. Ala. Dec. 9, 2021), *report and recommendation adopted*, 2021

WL 6137389 (M.D. Ala. Dec. 29, 2021) (finding no procedural due process violation under section 1983 when "no federal or state court decision, statute, regulation, or other source of law that gives him a constitutionally protected interest in the investigation of his assault claim or to the arrest of his alleged assailants"). Because Plaintiff cannot demonstrate that Defendants Smith and Schoolmeesters' actions or inactions deprived her of due process, Plaintiff's claim against Smith and Schoolmeesters in Count III is dismissed.

### d. *Monell* Claim—Count IV

Finally, Plaintiff alleges a *Monell* violation by the City of Tampa in Count IV. Dkt. 1 ¶ 198. Municipal entities may be held liable under section 1983 only where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). This standard requires a plaintiff to show that (1) "his constitutional rights were violated"; (2) "the municipality had a custom or policy that constituted deliberate indifference to that constitutional right"; and (3) "the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "Absent a formal policy, the plaintiff may satisfy the second element by identifying 'an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law' or 'a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights.'" *Plowright v.*

*Miami Dade Cnty.*, 102 F.4th 1358, 1370 (11th Cir. 2024) (quoting *Chabad Chayil,*

*Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022)).

    Here, Plaintiff's Complaint raises several arguments for why the City should

be liable, including under a theory of *respondeat superior*, inadequate training, and

inadequate supervision. Dkt. 1 ¶¶ 27, 198–221. As an initial matter, it has long been

held that a city cannot be liable under a theory of *respondeat superior*. *Monell*, 436

U.S. at 691. As for the other allegations against the City, they do not satisfy the

second element of a *Monell* claim. First, Plaintiff alleges that the City had

promulgated and permitted the following unconstitutional policies and customs:

> the training and retention of officers-not limited to probationary
> officers, the use of body-worn cameras, the internal investigations of
> officer misconduct and performance failures, the proper handling of
> citizen complaints, the production of public records, and the discipline
> and termination of officers who engage in misconduct or demonstrate
> incompetence. . . .
>
> (1) Field Training officers were pressured to pass failing probationary
> officers who were not ready to be on the streets; (2) officers did not
> properly investigate and clear calls for service (3) officers in the
> professional standards division did not properly investigate the
> misconduct and performance failures of their fellow officers; (4)
> officers in the professional standards division did not properly
> investigate or document citizen complaints against officers; (5) officers
> illegally detained citizens and committed other constitutional violations
> and misconduct and were not adequately trained, supervised,
> investigated, or disciplined.

Dkt. 1 ¶¶ 200–01. However, Plaintiff's Complaint does not identify any policy by

the City that permits the TPD to detain a person without reasonable suspicion or

probable cause, nor does it allege a custom via prior incidents where citizens were unlawfully detained following a shooting. Without such a showing, Ms. Robledo has failed to allege facts plausibly indicating that there was a custom or, even if there was, that the custom "constituted deliberate indifference to [her] constitutional right[s]." *McDowell*, 392 F.3d at 1289. Plaintiff's conclusory reference to unidentified "final policymakers in the City of Tampa" also fails to save her *Monell* claim from dismissal. Dkt. 1 ¶ 220; *see Iqbal*, 556 U.S. at 678 (recognizing that "formulaic recitation[s] of the elements of a cause of action" and "naked assertions devoid of further factual enhancement" are insufficient to state a claim for relief (alteration adopted and internal quotation marks omitted)).

Second, Plaintiff's claim against the City for inadequate training and supervision fares no better. Although a municipality can be held liable under section 1983 for a "policy- or custom-based failure to adequately train or supervise its employees," Plaintiff alleges no facts indicating that the City "was aware of the need to train or supervise its employees" on encounters with bystanders following a TPD officer's use of deadly force.[7] *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1188–89 (11th Cir. 2011). Indeed, there are no allegations in the Complaint that the City was on notice of a "widespread pattern of prior abuse"

---

[7] Plaintiff's reference to an (irrelevant) lawsuit by non-party John Fitzgerald concerning his retaliation and whistleblower suit against the TPD also fails to save her failure to train and supervise claim under *Monell*. *See* Dkt. 1 ¶¶ 124–33. The lawsuit involves TPD officers who are not part of this lawsuit and involves different circumstances from the alleged constitutional violation in this case.

or even a single earlier constitutional violation involving an unlawful detention following a shooting. *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998). While there are allegations that Defendants Cunningham and Estrada were "negligently passed" by the TPD during their probationary periods as new officers, Dkt. 1 ¶¶ 134–52, these allegations are wholly unrelated to the alleged constitutional violation at hand and provide no "evidence that the [City] knew of a need to train and/or supervise in a *particular area* and the [City] made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350 (emphasis added). To the extent that Ms. Robledo seeks to rely on news articles cited in the Complaint, that attempt also fails. *See* Dkt 1 ¶¶ 205–10. These articles involve incidents that occurred *after* Plaintiff's detention by TPD in March 2021, and they do not involve circumstances where a TPD officer unlawfully detained a person without reasonable suspicion or probable cause following a shooting. *See Plowright*, 102 F.4th at 1371 (rejecting a news article attached to a complaint because "[t]he article does not show that these incidents happened before [the alleged constitutional violation] or that they involved [similar] circumstances . . .").

Finally, the Court previously found that no underlying constitutional violation was committed by any Defendant-officer in this case. The lack of an underlying constitutional violation is dispositive of Plaintiff's claim for municipal liability. *See Swinford v. Santos*, 121 F.4th 179, 191 (11th Cir. 2024) ("[B]ecause we determine

that no underlying constitutional violation occurred, [the plaintiff's] supervisory liability claim against the chief of police and his *Monell* claim against the county fail as a matter of law."); *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) ("[B]ecause [the officers] committed no constitutional violations, their supervisors . . . cannot be found liable . . . for violating § 1983."); *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability . . . when there is no underlying constitutional violation."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (noting that the city of Los Angeles and the Police Commission could not be held liable under § 1983 if the individual officer "inflicted no constitutional injury" on the plaintiff). Because Plaintiff has failed to state a claim for municipal liability under *Monell*, the Court dismisses Count IV.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendants' Motions to Dismiss, Dkts. 10, 16, and 17, are **GRANTED.**

2. Plaintiff's Complaint, Dkt. 1, is **DISMISSED:**

   a. Plaintiff Robledo's claims against Officers Cunningham, Estrada, Murphy, and Sarrasin in Counts I and II (42 U.S.C. § 1983 Illegal Detention and Failure to Intervene) are **DISMISSED**;

b. Plaintiff Robledo's claims against Officers Smith and Schoolmeesters in Count III (42 U.S.C. § 1983 Procedural and Substantive Due Process) are **DISMISSED**; and

c. Plaintiff Robledo's claim against the City of Tampa in Count IV (42 U.S.C. § 1983 Municipal Liability) is **DISMISSED**.

**DONE AND ORDERED** at Tampa, Florida, on September 19, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**<u>COPIES FURNISHED TO:</u>**
Counsel of Record
Plaintiff, *pro se*